Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| SEVEN THREE SEVENTEEN, LLC.<br><br>Recurrente<br><br>V.<br><br>CONSEJO DE TITULARES THE RESIDENCE AT THE PARK, JUNTA DE DIRECTORES THE RESIDENCE AT THE PARK E ILDEFONSO TORRES<br><br>Recurridos | KLRA202400311 | Revisión de Administrativa procedente del Departamento de Asuntos del Consumidor<br><br>Caso de ref. Núm.: SAN-2022-0011995<br><br>Sobre:<br>Ley de Condominios |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Jueza Mateu Meléndez y el Juez Marrero Guerrero

Marrero Guerrero, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 21 de noviembre de 2024.

Comparece Seven Three Seventeen LLC (Seven Three o parte recurrente) y solicita que revoquemos la Resolución emitida el 13 de mayo de 2024, notificada el 14 de mayo de 2024, por el Departamento de Asuntos del Consumidor (DACo).[1] En dicha determinación, el DACo desestimó la querella presentada por la parte recurrente y, por consiguiente, ordenó el cierre y archivo de la querella.

Por los fundamentos que expondremos a continuación, confirmamos el dictamen recurrido.

-I-

La controversia ante nuestra consideración tiene su génesis en una derrama autorizada el 17 de enero de 2022, en exceso de $300,000 con el objetivo de realizar una modernización de

---

[1] Véase apéndice de la recurrente, págs. 407-420.

elevadores y sistema de cámaras. Surge del expediente que The Residence at the Park (Condominio) es un condominio localizado en San Juan, que se encuentra sometido al régimen de Propiedad Horizontal y consta de 14 aparamentos de carácter residencial. Aproximadamente en el año 2016, el Condominio comenzó a experimentar dificultades con los dos elevadores de pasajeros que utilizan los residentes. Para el año 2021 los problemas se agudizaron de manera tal, que los residentes se quedaban encerrados en los elevadores semanalmente. Esto redundó en un sinnúmero de quejas por parte de los residentes y la administración del Condominio recibía hasta 12 llamadas semanales sobre este asunto. Ante este cuadro, la Junta de Directores del Condominio convocó a los titulares a una Asamblea Ordinaria (Asamblea) a celebrarse el 17 de enero de 2022.[2]

Surge de la Minuta de la Asamblea que la Junta de Directores ofreció un breve resumen sobre la situación de los elevadores y prontamente le concedió la palabra al Sr. Sergio Rivera, representante de Cruz Moya Elevator Consultants.[3] Previo a la Asamblea, la Ingeniera Alba Cruz Moya (Ing. Cruz Moya) de Cruz Moya Elevator Consultants inspeccionó los elevadores del Condominio y preparó un informe mecánico. El Sr. Sergio Rivera asistió a la Asamblea en sustitución de la Ing. Cruz Moya, quien se encontraba indispuesta, y brindó una presentación sobre el informe que ésta preparó y aclaró las dudas de los titulares. Por otro lado, puntualizó que la vida útil de los elevadores estaba próxima a acabar y que, en ese momento, los elevadores representaban un asunto de seguridad.

A la Asamblea también comparecieron representantes de la compañía Deya Elevator Service Inc. (Deya Elevator) que ofrecieron

---

[2] Véase apéndice de la parte recurrente, págs. 17-18.
[3] Véase apéndice de la parte recurrente, págs. 4-13.

una presentación sobre su propuesta de modernización de los elevadores; la cual se les envió a todos los titulares con anterioridad. Por otro lado, los representantes de Deya Elevator dieron un insumo de la condición de los elevadores y, además, aclararon las dudas de los titulares sobre el proceso de modernización.

Finalizadas las presentaciones de los invitados, la Junta de Directores abrió un foro de discusión sobre el tema de los elevadores. Luego de que los titulares discutieran el asunto y se expresaran al respecto, se presentó la siguiente moción:

> *Entendiendo que las condiciones actuales de los elevadores presentan un asunto de seguridad propone que se realice una derrama para modernizar los elevadores por la cantidad de $297,000.00 comenzando en febrero de 2022 y teniendo una duración de 18 meses.*

Presentada la moción, los titulares procedieron a votar. El resultado de esta votación fue de 11 votos a favor de la medida y 1 voto en contra. Este único voto provino de Seven Three. Así las cosas, la medida se aprobó por una mayoría de un 86.89% de los titulares.

Por estos hechos, Seven Three presentó una querella el 22 de agosto de 2022 ante el DACo en contra del Consejo de Titulares del Condominio, su Junta de Directores y el Presidente de la Junta,[4] (en conjunto, Consejo de Titulares o parte recurrida).[5] Alegó que la derrama autorizada en exceso de $300,000 no fue aprobada de manera unánime. Arguyó, además, que la derrama se impuso de manera ilegal, ya que su objetivo era la realización de mejoras, modernización de los ascensores y el sistema de cámaras del condominio. Solicitó se emitiera una orden declarando nula la derrama por obras de mejoras por no haber sido adoptada

---

[4] El señor Ildefonso Torres.
[5] Véase apéndice de la parte recurrente, págs. 1–3.

unánimemente, la imposición de costas y honorarios, e imposición de multas a la Junta de Directores y su Presidente.

El 15 de septiembre de 2022 el Consejo de Titulares presentó *Moción Solicitando Desestimación de la Querella.*[6] En resumen, alegó que la controversia se había tornado académica porque Seven Three había hecho unos pagos de la derrama, por lo que renunció a cualquier reclamación al realizar el pago.

Luego de varios trámites procesales, el DACo emitió una *Resolución Sumaria* el 15 de diciembre de 2022, notificada al día siguiente.[7] Allí —sin contar con la oposición de Seven Three— determinó que no había controversia esencial sobre ningún hecho material, por lo que procedía que la reclamación se resolviera de manera sumaria. En síntesis, DACo determinó que la Querella se presentó de manera tardía y que la controversia se tornó académica porque Seven Three pagó una porción de la derrama.

El 5 de enero de 2023, Seven Three presentó una *Solicitud de Reconsideración o Aclaración.*[8] Argumentó, entre otros asuntos, que no había pagado la totalidad de la "derrama nula", que ascendía a $21,876.66 en su caso. Por ello, Seven Three alegó que el pago parcial de la misma no tenía efecto jurídico vinculante. Debido a que DACo nunca advirtió que actuara en torno a la solicitud de reconsideración, Seven Three la consideró rechazada de plano.

Por lo que, el 21 de febrero de 2023, presentó un *Recurso de Revisión* ante esta Curia.[9] En apretada síntesis, nos planteó la comisión de dos errores: 1) la inexistencia de un término prescriptivo para la impugnación de una acción nula de un Consejo de Titulares, y 2) el pago parcial de la derrama y la academicidad de la Querella.

---

[6] Véase apéndice de la parte recurrente, págs. 112-115.
[7] Véase apéndice de la parte recurrente, págs. 125-131.
[8] Véase apéndice de la parte recurrente, págs. 138-149.
[9] Véase KLRA202300086.

En aquella ocasión, determinamos que bajo ninguna circunstancia podíamos resolver que la querella presentada por Seven Three fue resuelta, ya que los pagos parciales no tornaban en académica la controversia. Señalamos que DACo podía ordenar la devolución de cualquier cantidad de dinero que un querellante haya pagado —total o parcial— de forma ilegal. Por ello, la querella no había perdido su carácter adversativo y el remedio que en su día el DACo pudiera concederle. Por otro lado, puntualizamos que la controversia principal estribaba en *si la derrama impuesta es nula o no.* Si DACo encontraba que la derrama era nula, procedía la devolución de todo el dinero pagado. En consecuencia, sí existía una controversia real entre las partes.

Por otro lado, determinamos que no podíamos declarar nula la acción del Consejo de Titulares, ya que el DACo no hizo determinación alguna que distinguiera si se trataba o no de una obra de mejora. Señalamos que la *Moción Solicitando Desestimación de la Querella* presentada por Consejo de Titulares se limitó a indicar que la referida Querella se había tornado académica al pagarse la totalidad de la derrama impugnada por el recurrente. Por lo que, la parte recurrida no argumentó si se trataba o no de una obra de mejoras, ya que entendió que dicha Querella era académica. Por lo tanto, el DACo no tuvo ante sí evidencia de las partes para contender si se trataba o no de una obra de mejoras. Así las cosas, decidimos devolver el caso al DACo para que las partes desfilara prueba y determinara si se trataba o no de una obra de mejoras.

Luego de varios trámites procesales, y en cumplimiento con nuestras directrices, el DACo celebró una Vista Administrativa el 19 de marzo de 2024.

Según surge de la Transcripción de la Prueba Oral (TPO) que, el testimonio presentado por Seven Three, en síntesis, fue:

- El **Señor Wilfred Hsu** (señor Hsu) **–** Miembro gerencial de la compañía de responsabilidad limitada. Cuenta con sobre 35 años de experiencia en el mercado de bienes raíces.

*El señor Hsu declaró que durante la Asamblea del 17 de enero de 2022, un representante de la compañía Deya Elevator se personó y alegó ser un experto sobre elevadores.[10] Arguyó el señor Hsu que el representante de Deya Elevator alegó que los elevadores del Condominio estaban próximos a completar su vida útil y que necesitaba reemplazo o **remodelación**.[11] El señor Hsu alegó que en varias instancias que los elevadores no están diseñados para funcionar por 12 o 15 años.[12] Alegó el señor Hsu que **la experiencia y el sentido común** le dice a todos los que han utilizado un elevador que sobrepasa los 40 o 50 años, que estos permanecen útiles y confiables.[13]*

*Añadió el señor Hsu que durante la Asamblea increpó sobre los "hechos" presentados por el "experto" y su validez.[14] Alegó, por otro lado, que varios de los residentes alegaron sentirse preocupados porque se les habían comunicado que los elevadores no eran seguros.[15] Sin embargo, el señor Hsu aseguró que el elevador era seguro y que no había ocurrido nada malo con ellos.[16]*

*El señor Hsu declaró que hubo discusiones sobre este último punto, pero que quedó silenciado porque las personas elegidas a la Junta de Directores tienen su propia agenda.[17] Además, alegó que la Junta de Directores intentó desacreditarlo antes y después de la Asamblea bajo el pretexto de que enloqueció y solo quería interrumpir la Asamblea.[18]*

*No obstante, aseguró que nada podía estar más lejos de la verdad puesto que, ha estado por 35 años en el mercado de bienes raíces y que una persona con esa experiencia usualmente es considerada un **experto**.[19] De hecho, el señor Hsu se autodenominó como un experto en la materia de elevadores y alegó que en la Asamblea el Consejo de Titulares se rehusó a escuchar la voz de la razón porque preferían escuchar el testimonio falso del autodenominado experto que tenía su propia agenda.[20]*

*El señor Hsu añadió que es dueño de un edificio en Santurce que sobrepasa los 50 años y que, en la actualidad, el elevador del edificio funcionaba.[21] Declaró que el motor era viejo, sobre unos 40 o 50 años, y que no cuestionaba la seguridad y operación de ese elevador o de otros elevadores de igual antigüedad.[22] Que era cuestión de mantenimiento.[23]*

*Sobre la derrama, el señor Hsu declaró que pagó una porción de esta porque afirmó sentirse coaccionado porque recibió una carta advirtiéndole que, de no pagar la derrama, se le privaría de las utilidades y de sus derechos como propietario.[24]*

---

[10] TPO, pág. 21, líneas 1-3.
[11] TPO, pág. 21, líneas 4-6.
[12] TPO, pág. 21, líneas 10-12.
[13] TPO, pág. 21, líneas 12-15.
[14] TPO, pág. 21, líneas 16-18.
[15] TPO, pág. 21, líneas 18-20.
[16] TPO, pág. 21, líneas 20-21.
[17] TPO, pág. 21, líneas 22-24.
[18] TPO, pág. 21, línea 24 y pág. 22, línea 1.
[19] TPO, pág. 22, líneas 2-6.
[20] TPO, pág. 22, líneas 7-12.
[21] TPO, pág. 23. líneas 17-20.
[22] TPO, pág. 23, líneas 21-24.
[23] TPO, pág. 23, línea 25.
[24] TPO, pág. 33, líneas 6-10.

*En el contrainterrogatorio, el señor Hsu reafirmó que discrepaba un 110% con el señalamiento de la Ing. Cruz Moya sobre la vida útil de los elevadores.[25] Que esa declaración es falsa y que cualquier profesional de construcción se reiría al escuchar que los elevadores están diseñados para tener una vida útil de 15 años.[26] Añadió el señor Hsu que cualquier persona con un cerebro que no esté defectuoso sabe que la apreciación de los expertos es una mentira.[27] El señor Hsu declaró que su opinión se basa en su experiencia, el sentido común y las experiencias de todo el mundo.[28]*

Surge también de la TPO que, los testimonios presentados por el Consejo de Titulares, en síntesis, fueron:

- La **Sra. Bárbara Martínez Martínez** (señora Martínez Martínez) **–** Administradora de condominios y propiedades. Administradora del Condominio.

  *La señora Martínez Martínez declaró que como administradora del Condominio está a cargo de las áreas comunes, realizar el "data entry" de la contabilidad, trabajar con los suplidores, contratistas, con la Junta de Directores y el Consejo de Titulares.[29]*

  *Declaró que desde el 2016, los titulares del Condominio comenzaron a tener problemas con los elevadores.[30] Específicamente, que los residentes del Condominio se quedaban encerrados en los elevadores en el piso 2, piso 5, piso 14 y el Pent-house. Que, por ello, recibían múltiples quejas. En primera instancia, el señor Héctor González, guardia de seguridad del Condominio, recibía las quejas de los residentes y este se las reportaban de inmediato a la señora Martínez Martínez.[31] Entonces ella se comunicaba con la compañía que les brinda servicios a los elevadores del Condominio.[32] Esto sucedía tres veces a la semana y se recibían más de doce llamadas ya fuese porque se quedó el elevador o una persona encerrada en él.[33]*

  *La señora Martínez Martínez declaró que, para finales del 2021, la administración se reunió con la Junta de Directores porque existía una preocupación genuina en torno al asunto de los elevadores. Sobre todo, por las personas mayores.[34] Luego consultaron con el personal de Deya Elevator y con la Ing. Cruz Moya, la inspectora a cargo de las inspecciones mecánicas anuales de los elevadores del Condominio.[35] Explicó la señora Martínez Martínez que en la reunión se acordó que Deya Elevator se encargaría de reparar los elevadores y así se hizo. No obstante, el problema persistió.*

  *Ante este cuadro, la Junta de Directores le solicitó a la Ing. Cruz Moya que inspeccionara los elevadores e hiciera un informe sobre ello. Ese informe luego se presentó en la Asamblea del 17 de enero de 2022. La señora Martínez Martínez no estuvo presente durante la inspección de los elevadores.*

  *Añadió la señora Martínez Martínez que su participación en la susodicha Asamblea se limitó a la contabilización de*

---

[25] TPO, pág. 45, líneas 14-17.
[26] TPO, pág. 45, líneas 17-21.
[27] TPO, pág. 45, líneas 21-23.
[28] TPO, pág. 45, línea 25 y pág. 46, línea 1.
[29] TPO, pág. 58, líneas 17-21.
[30] TPO, pág. 59, líneas 23-25 y pág. 60, líneas 1-2.
[31] TPO, pág. 60, líneas 9-12.
[32] TPO, pág. 60, líneas 15-17.
[33] TPO, pág. 61, líneas 11-12 y pág. 62, líneas 16-20.
[34] TPO, pág. 63, líneas 16-21.
[35] TPO, pág. 64.

*los votos. Que en el caso de la derrama en controversia, hubo once votos a favor de la derrama y uno en contra.*

- La Ing. Cruz Moya **–** Ingeniera Mecánica encargada de las inspecciones anuales de los elevadores del Condominio.

  *La Ing. Cruz Moya declaró que posee un bachillerato en ingeniera mecánica de la Universidad de Puerto Rico, Recinto de Mayagüez y una maestría en ingeniería gerencial de la Universidad Politécnica. Hace 31 años se dedica a la inspección de elevadores.*

  *Sobre la inspección de elevadores, la Ing. Cruz Moya declaró que esta actividad está regulada por Puerto Rico OSHA (PROSHA) a través del Reglamento Número 18 del Departamento del Trabajo.[36] El Reglamento Número 18, según declaró la ingeniera, establece los códigos y las guías que se utilizan en la inspección, instalación y mantenimiento de los elevadores.[37]*

  *En cuanto a los elevadores del Condominio, la Ing. Cruz Moya declaró que tenían una particularidad: estos elevadores eran "machine room-less" o ascensor sin cuarto de máquina.[38] Esto significa que la maquinaria que hace funcionar al elevador está dentro del hueco donde se mueve el elevador en lugar de estar en un cuarto apartado.[39] Este tipo de elevador, que entró al mercado en el 2005, era producido por la fabricadora Northern Elevators. La Ing, Cruz Moya hizo hincapié en que esta fabricadora ya no existe y que el modelo de elevador Time 3200 –el modelo del elevador del Condominio– ya no existe en el mercado.[40]*

  *Sobre el elevador del Condominio, le Ing, cruz Moya declaró que la administración del Condominio la contactó para una inspección en el año 2021 debido a los problemas con el funcionamiento de los elevadores. La ingeniera inspeccionó el controlador, máquina, todos los equipos que están encima de la cabina, la puerta y el foso, al igual que los componentes neurálgicos del equipo.[41]*

  *Según la Ing. Cruz Moya, la actualización d ellos elevadores se refiere al código que adopta el Reglamento Número 18, que es el ASME A17.1.[42] Este código cambia cada tres años y ocho meses y su propósito es generar cambios en la tecnología de los elevadores.[43]*

  *Sobre su informe, la Ing. Cruz Moyá declaró que su recomendación se basó en que la vida útil de un ascensor dependerá de su mantenimiento preventivo, marca, uso, tecnología y modelo.[44] Que en el caso del Condominio, la marca de su elevador ya no existe. Por ello, la ingeniera entendió que el Condominio tenía dos alternativas: la primera era reparar el elevador por fases y la segunda realizar una modernización completa en una sola fase y comenzar un nuevo ciclo de vida útil para todos los componentes.[45] La recomendación de la Ing. Cruz Moya fue la segunda alternativa.*

  *En cuanto a la frase "modernización completa", la ingeniera declaró que en la industria de los elevadores, la palabra "modernización" se refiere a la alteración del*

---

[36] TPO, pág. 96, líneas 24-25 y pág. 97, línea 1.
[37] TPO, pág. 97, líneas 1-4.
[38] TPO, pág. 97, líneas 11-13.
[39] TPO, pág. 97, líneas 18-20.
[40] TPO, pág. 98, líneas 3-6.
[41] TPO, pág. 100, líneas 20-22.
[42] TPO, pág. 103, líneas 2-3.
[43] TPO, pág. 103, líneas 3-8.
[44] TPO, pág. 107, líneas 22-24.
[45] TPO, pág. 108, líneas 4-8.

*equipo.[46] La modernización representa el fin de la ida útil de los elevadores.[47]*

*En el caso del Condominio, la Ing. Cruz Moya opinó que se debían cambiar los "cerebros" de los elevadores y, si se incurre en ese gasto, es mejor comenzar una vida útil donde todos los componentes se pueden comunicar de manera efectiva con el nuevo "cerebro".[48]*

*En el contrainterrogatorio, la Ing. Cruz Moya declaró.*

El 13 de mayo de 2024, el DACo emitió la *Resolución* recurrida.[49] Mediante esta, el DACo determinó que la derrama en controversia no era nula ya que la reparación de los elevadores no era una obra de mejora según definida en el Artículo 3 de la Ley de Condominios de Puerto Rico, sino que era una *obra extraordinaria*. Cónsono con lo anterior, el DACo desestimó la *Querella* de Seven Three, no sin antes hacer las siguientes determinaciones de hechos:

1. La parte querellante, Seven Three Seventeen LLC es titular del apartamento 7 del Condominio The Residence at the Park localizado en San Juan, Puerto Rico. Adquirió dicha propiedad mediante la escritura número 559, otorgada el 3 de julio de 2017 ante el notario Néstor Machado Cortés.

2. El presidente de la corporación querellante lo es el señor Wilfred Hsu. Este es inversionista y desarrollador de propiedades. El señor Hsu no reside en el condominio The Residence at the Park.

3. El condominio The Residence at the Park se encuentra sometido al régimen de Propiedad Horizontal y consta de 14 apartamentos de carácter residencial.

4. Desde aproximadamente el año 2016, en el condominio The Residence at the Park se comenzó a tener problemas con los dos ascensores que tiene el mismo. A pesar de que a dichos ascensores se les brinda el mantenimiento requerido, los residentes y usuarios de los ascensores se quedaban encerrados en los mismos semanalmente. Debido a esto había un sin número de quejas de los residentes y la administración recibía hasta 12 llamadas semanalmente reportando problemas por personas que se quedaban encerradas en los ascensores y estos procedían a reparar los mismo.

5. Debido a la situación anteriormente expresada, la Junta de Directores hizo una reunión con la compañía Deya, que era la encargada de dar mantenimiento y realizar las reparaciones, para ver qué se podía hacer con el problema de los ascensores, los cuales se dañaban

---

[46] TPO, pág. 108, líneas 22-24.
[47] TPO, pág. 109, líneas 7-9.
[48] TPO, pág. 111.
[49] Véase apéndice de la parte recurrente, págs. 407-420.

constantemente. Luego de esto hubo varias reparaciones, pero las mismas no fueron efectivas, toda vez que los ascensores continuaban dañándose y se quedaban entre pisos.

6. A principio del año 2021, la Ingeniera Alba cruz Moya, quien es inspectora de elevadores, realizó una inspección mecánica de los mismos. Como producto de dicha inspección, la Ingeniera Cruz Moya realizó un informe que se le envió a los titulares del condominio. Conforme dicho informe, se indicó en síntesis que la vida útil de los ascensores estaba próxima a acabar y que dicho asunto era uno de seguridad.

7. Conforme el testimonio de la Ingeniera Cruz Moya, los ascensores del condominio The Residence at the Park tenían muchos problemas recurrentes y ésta revisó todos sus componentes para evaluar su condición. Los códigos aplicables a dichos ascensores son del año 2005. Según su informe, la vida útil de dichos ascensores es de 15 a 18 años y existen algunos componentes que han sido descontinuados, toda vez que el fabricante de dichos ascensores ya no existe. La Ingeniera Cruz estableció que la industria de los ascensores se ha movido a una mayor tecnología, por lo que la vida útil de los ascensores es menor. Cuando un ascensor llega a su vida útil, hay que actualizarlo y modernizarlo cambiando ciertos equipos de acuerdo a los códigos vigentes según el reglamento. El no realizar esta actualización puede afectar la seguridad, por lo que hay que realizarlo antes de que haya una crisis.

8. El pasado 17 de enero de 2022 se llevó a cabo una Asamblea ordinaria del Consejo de Titulares del Condominio The Residence at the Park. Entre los asuntos a discutirse en dicha asamblea se encontraba la discusión y aprobación de una derrama para dos proyectos: a) modernización de elevador- $297,000.00 y b) Cámaras para áreas comunes- $6,000.00. La parte querellante estuvo presente en la asamblea y participó en la misma.

9. Conforme la minuta de la asamblea celebrada el 17 de enero de 2022 y que fue remitida a todos los titulares, se explicó en síntesis que el asunto de los elevadores era uno de seguridad, toda vez que se indicó que la vida útil de los mismos estaba próxima a acabar. Hubo representantes de la compañía Deya Elevator, quienes brindaron una presentación de la propuesta de modernización de los ascensores que había sido enviada previamente a todos los titulares y dieron un insumo sobre la condición actual de los elevadores. Igualmente contestaron las preguntas y aclararon dudas de los presentes. Luego de lo anterior, se aprobó la derrama propuesta por $297,000.00 comenzando en febrero de 2022 y teniendo una duración de 18 meses. La votación fue de 11 votos a favor y 2 en contra. El único voto en contra fue el de la parte querellante. No surge de la Minuta de la asamblea que la parte querellante hubiese expresado fundamento alguno para su objeción.

10. El 23 de agosto de 2022 la parte querellante presentó la querella de epígrafe a través del internet. En la misma solicita en síntesis la anulación de la derrama aprobada y la imposición de una multa al Consejo de Titulares y la Junta de Directores.

11. Durante la vista administrativa el señor Hsu indicó, que contrario a lo indicado por la Ingeniera Alba Cruz, los ascensores no duran 15 años. Para realizar esta aseveración indicó que se basa en que conoce edificios que tienen ascensores de 40 o 50 años y su experiencia como inversionista y desarrollador; y en el sentido común. Indicó que dichos ascensores lo que requieren es mantenimiento. El señor Hsu no es perito, ni presentó prueba pericial alguna para sustentar esta aseveración.

12. La responsabilidad total de la parte querellante sobe dicha derrama es de $21,443.46 a ser pagados en 18 mensualidades de $1,191.30. Mediante el cheque número 1558 con fecha de 29 de julio de 2022 por la cantidad de $5, 956.50, la parte querellante pagó parte de la derrama que pretende impugnar mediante la querella de epígrafe. No ha realizado ningún otro pago adicional.[50]

Tras repasar los Artículos 65 y 66 de la Ley Núm. 129-2020, según enmendada, el DACo pasó a analizar los Artículos 49 y 52 de la Ley de dicha ley y expresó lo siguiente:

De un análisis de la prueba presentada, debemos concluir que en el presente caso la actualización o modernización de los ascensores, no constituye una obra de mejora, sino una obra extraordinaria de mantenimiento, la cual no estaba presupuestada. El propósito de la obra aprobada no iba dirigido a aumentar el valor o la productividad de la propiedad, o a proveer un mejor servicio. Dicha obra iba dirigida a que los ascensores funcionaran como es debido de acuerdo a su destino, brindando el servicio para el que fueron diseñados e instalados dentro del condominio. La prueba no controvertida estableció que los ascensores en el condominio The Residence at the Park no estaban brindando el servicio para el que fueron instalados, toda vez que se dañaban constantemente, impidiendo que los titulares y residentes de los pisos superiores pudiesen tener acceso seguro y efectivo a sus apartamentos. Ciertamente, esto no era padecido por la parte querellante, toda vez que admitió que no vive en el condominio. A nuestro juicio, de acuerdo a la prueba presentada, la obra de actualización o modernización de los ascensores es una obra extraordinaria que no constituye una mejora, por lo que no requiere unanimidad, a pesar de haberse aprobado una derrama. La impugnación presentada por la parte querellante es improcedente.

---

[50] Véase apéndice de la parte recurrente, págs. 408-409. Énfasis en original.

Además, el DACo concluyó que la alegación de Seven Three sobre la vida útil de los ascensores era improcedente, ya que el señor Hsu no era perito en la materia ni presentó prueba pericial que respaldara su alegación. Así lo expresó:

> No obstante, aun presumiendo para efectos de análisis que dicha obra pudiese ser considerada como una obra de mejora que requiera unanimidad, la impugnación presentada por la parte querellante es igualmente improcedente. De un análisis de la prueba presentada, surge que la obra de actualización o modernización de los ascensores fue aprobada por todos los titulares, con excepción del voto solitario en contra de la parte querellante. No obstante, la parte querellante no fundamentó su voto en contra durante la asamblea o por escrito, tal y como requiere el Art. 52, inciso c) de la Ley de Condominios antes citado. La parte querellante simplemente se limitó a indicar durante la cista administrativa que a base a su experiencia como inversionista y desarrollador los ascensores deben durar entre 40 a 50 años. No presentó prueba pericial alguna que sostenga esta alegación. Tampoco presentó prueba alguna que estableciera que los ascensores no estaban llegando al final de su vida útil conforme fue determinado por un perito. De acuerdo a lo anterior, la objeción presentada por la parte querellante debe considerarse infundada y tenerse por no puesta.[51]

Inconforme, Seven Three acude ante nos nuevamente y alega que el DACo incidió de las siguientes maneras:

A. Erró el DACo al pasar por alto los criterios rectores adjudicativos que pautara este Tribunal de Apelaciones en ocasión de su Sentencia en el caso KLRA202300086.

B. Erró el DACo al pasar ignorar la prueba pericial contundente que acreditara que el proyecto interesado era un ejercicio de conveniencia y mejora, y no una obra urgente o extraordinaria que requiriera una atención impostergable.

El Consejo de Titulares compareció mediante escrito en oposición. Contando con la comparecencia de ambas partes, procedemos a resolver.

-II-

A.

---

Es norma conocida que los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, puesto que estas cuentan con vasta experiencia y pericia para atender aquellos asuntos que se les han sido delegados por la Asamblea Legislativa. *Oficina de Ética Gubernamental v. Martínez Giraud*, 210 DPR 79, 88-89. (2022); *Super Asphalt v. AFI y otros*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018); *Torres Rivera v. Policía de PR*, 196 DPR 606, 626 (2016); *Asoc. Fcias. v. Caribe Specialty et al. II*, 179 DPR 923, 940 (2010).

Por estas razones, dichas determinaciones suponen una presunción de legalidad y corrección, que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente para derrotarlas. *Oficina de Ética Gubernamental v. Martínez Giraud, supra*; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216 (2012). No obstante, tal norma no es absoluta, por lo que nuestro Máximo Foro ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia, a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.

Por esa misma línea, en *Torres Rivera v. Policía de Puerto Rico, supra,* nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la forma siguiente:

> *Los tribunales deben deferencia a las decisiones de una agencia administrativa, pero tal deferencia cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la*

*actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida.*

Del mismo modo, la Sec. 4.5 de la Ley Núm. 38 del 30 de junio de 2017, 3 LPRA 9675, conocida como la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), estableció el marco de revisión judicial de las agencias administrativas. *Rolón Martínez v. Supte. Policía, supra.* La intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas. *Íd.*; *Oficina de Ética Gubernamental v. Martínez Giraud, supra; Torres Rivera v. Policía de PR, supra; Nobbe v. Jta. Directores, supra*; Sec. 4.5 de la LPAU, 3 LPRA sec. 9675. Por lo tanto, aquellas determinaciones de hechos formuladas por el ente administrativo deberán sostenerse cuando estén basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Oficina de Ética Gubernamental v. Martínez Giraud, supra;Super Asphalt v. AFI y otros, supra.*

Ahora bien, las determinaciones de derecho pueden ser revisadas en su totalidad. *Rolón Martínez v. Supte. Policía, supra,* pág. 36; *Torres Rivera v. Policía de PR, supra,* pág. 627; Sec. 4.5 LPAU, 3 LPRA sec. 9675. No obstante, los tribunales deberán darles peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra. *Rolón Martínez v. Supte. Policía, supra; Torres Rivera v. Policía de PR, supra.* Esto, pues el Tribunal Supremo ha dispuesto que la

deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: (1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales. *Íd*; *Oficina de Ética Gubernamental v. Martínez Giraud, supra.*

Finalmente, destacamos que el criterio administrativo no podrá prevalecer en aquellas instancias donde la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Lo anterior ya que la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia. *Íd.*

B.

La Ley de Condominios de Puerto Rico de 2020, Ley Núm. 129 de 16 de agosto de 2020, según enmendada, 31 LPRA secs. 1921-1923r, (Ley Núm. 129-2020 o Ley de Condominios) tiene el propósito de "viabilizar la propiedad individual sobre un apartamiento, que forma parte de un edificio o inmueble sometido al régimen de propiedad horizontal". 31 LPRA sec. 1921a. A su vez, incorpora una serie de cambios que precisamente facilitan la convivencia en los condominios, esta vez introduciendo tendencias que se nutren de los desarrollos tecnológicos modernos, así como de las lecciones aprendidas como consecuencia de la crisis económica de la Isla y de las situaciones de emergencia que sufrió la Isla por el huracán María. Ley Núm. 129-2020, Exposición de Motivos, pág. 2.

Cónsono con lo anterior, la Ley 129-2020 mantiene como figura principal en el régimen de propiedad horizontal el Consejo

de Titulares, un organismo con personalidad jurídica propia que está integrado por todos los titulares y que *"constituye la autoridad suprema sobre la administración del inmueble [...]"*. 31 LPRA sec. 1922t. En cuanto a los deberes y las facultades del Consejo de Titulares, el Artículo 49 dispone que, entre otros asuntos, le corresponde a este organismo aprobar la ejecución de obras extraordinarias, urgentes o de mejoras y recabar fondos para su realización. 31 LPRA sec. 1922u(d).

En cuanto a las obras extraordinarias, urgentes o de mejoras, el Artículo 3 de la Ley Núm.129-2020 provee unas definiciones que, según nuestro Tribunal Supremo, proveen diferenciaciones rigurosas y claras. *Pérez Riera v. Con. Tit. Cond. Marymar*, 197 DPR 197, 205 (2017). A saber:

> ***Obra de Mejora*** — Toda obra permanente que no sea de mantenimiento, dirigida a aumentar el valor o la productividad de la propiedad en cuestión o a proveer mejores servicios para el disfrute de los apartamentos o de las áreas comunes.
>
> ***Obra Extraordinaria*** — Toda obra de mantenimiento no prevista en el presupuesto anual, que requiera la imposición de una derrama para su ejecución.
>
> ***Obra Urgente*** — Toda obra cuya ejecución no pueda posponerse por razones apremiantes de seguridad o porque sea necesaria para la restitución de los servicios esenciales, tales como el suministro de agua, de electricidad o <u>la puesta en funcionamiento de los ascensores</u>. 31 LPRA secc. 1921b. (Énfasis suplido)

En lo que respecta a las **obras de mejoras**, se distinguen de los otros dos tipos de obra (**extraordinaria** y **urgente**) en que *no son obras de mantenimiento, ni mucho menos necesarias para el sostenimiento del condominio*. Entiéndase, las obras de mejoras van dirigidas al *"lujo u ornato o [a la] mera conveniencia [...]"*. *Pérez Riera v. Con. Tit. Cond. Marymar*, *supra*, a la pág. 206, *citando a* Ventura-Traveset y González, *Derecho de propiedad horizontal*, 4ta ed., Barcelona, Ed. Bosch, 1980, pág. 275. En cuanto a las obras extraordinarias y urgentes, bien se podría decir que la primera se

trata de obras de mantenimiento —no prevista en el presupuesto anual— que requiere una derrama para su ejecución. Mientras que las obras urgentes, son situaciones impostergables de seguridad o, para la restitución de los servicios esenciales, como el agua, electricidad o *la puesta en funcionamiento de los ascensores.*

Por otro lado, cuando se trata de la aprobación de **obras extraordinarias, urgentes y de mejoras**, la Ley de Condominios dispone lo siguientes en su Artículo 49 (d):

> ***Obras extraordinarias***. El Director, el Presidente y/o Tesorero podrán realizar retiros del <u>fondo de reserva</u> para costear este tipo de obra, previa autorización <u>mayoritaria</u> del Consejo de Titulares debidamente convocado en asamblea extraordinaria.
>
> ***Obras urgentes****.* El Director, Presidente y/o Tesorero podrán realizar retiros del <u>fondo de reserva</u> para toda obra urgente no prevista en el presupuesto anual, previa autorización **<u>mayoritaria</u>** del Consejo de Titulares debidamente convocado en asamblea extraordinaria para atender este asunto específico. La asamblea para autorizar el desembolso se convocará y celebrará en un término expedido no menor de veinticuatro (24) horas. La notificación podrá ser mediante entrega personal, debajo de cada puerta o por cualquier medio alterno disponible, incluyendo correo electrónico.
>
> ***Obras de mejoras****.* Las obras de mejora sólo podrán realizarse, **mediante la aprobación de dos terceras partes (2/3) de los titulares que a su vez reúnan las dos terceras partes (2/3) de las participaciones en las áreas comunes**. <u>Se requerirá el consentimiento **unánime** del Consejo de Titulares cuando dichas obras de mejoras requieran **derrama**</u>. 31 LPRA sec. 1922u, inciso (d) (1), (2) & (3). (Énfasis suplido)

Como vemos, para aprobar **obras de mejoras**, de ordinario es indispensable la concurrencia de dos requisitos, a saber: **(1)** el voto de una mayoría cualificada; esto es, de dos terceras (2/3) partes de todos los titulares, y **(2)** que existan fondos de reserva suficientes para costearlas sin necesidad de imponer una derrama. *Pérez Riera v. Con. Tit. Cond. Marymar*, *supra*, a la pág. 209. Por lo tanto, en el caso de que la obra de mejora <u>no requiera la imposición de una derrama</u>, la aprobación del acuerdo requiere dos terceras (2/3) partes de todos los titulares. Sin embargo, <u>cuando la obra requiera la imposición de una derrama</u>, el <u>voto</u>

unánime de todos los titulares se convierte en un requisito.

Por su parte, las **obras extraordinarias** y las **obras urgentes**, que se estimen del fondo de reserva, solo requieren el voto de la mayoría de todos los titulares. Nótese que, distinto a las obras de mejoras, no se impone unanimidad cuando las **obras extraordinarias** y las **obras urgentes** requieran la imposición de una derrama.

En ese sentido, las normas para los acuerdos del Consejo de Titulares, el Artículo 52 de la Ley Núm.129-2020, 31 LPRA sec. 1922x, dispone en lo pertinente al caso de marras:

> (a) Los titulares presentes en la asamblea tendrán autoridad para determinar discutir o dar por discutidos los asuntos contenidos en la agenda de la asamblea.
>
> (b) **La mayoría** requerida reglamentariamente para la adopción de acuerdos **se computará tomando como cien por ciento (100%) el número de titulares presentes o representados al momento de votarse por el acuerdo, excepto** en aquellos casos en que **se requiera** unanimidad o del voto de dos terceras partes (2/3) de todos los titulares, que a su vez, reúnan dos terceras partes (2/3) de las participaciones en las áreas comunes, en cuyo caso, se requerirá dar cumplimiento con las disposiciones del inciso (c), siguiente.
>
> (c) **Cuando los titulares presentes en una asamblea convocada para tomar un acuerdo que requiera unanimidad o de dos terceras partes (2/3) de todos los titulares**, que a su vez, reúnan dos terceras partes (2/3) de las participaciones en las áreas comunes estos adoptasen dicho acuerdo, **aquellos que, debidamente citados no hubieren asistido serán notificados** de modo fehaciente y detallado del acuerdo adoptado**, y, si en un plazo de treinta (30) días a partir de dicha notificación no manifestaren** en la misma forma **su discrepancia**, **quedarán vinculados por el acuerdo** que no será ejecutable hasta que transcurra tal plazo, salvo que antes manifestaren su conformidad.
>
> **La oposición a un acuerdo que requiera unanimidad o dos terceras partes (2/3) de todos los titulares** que a su vez reúnan dos terceras partes (2/3) de las participaciones en las áreas comunes **deberá fundamentarse expresamente, bien en la asamblea o por escrito,** según se dispone en el párrafo anterior, y en ningún caso podrá basarse en el capricho o en la mera invocación del derecho de propiedad. **La oposición infundada se tendrá por no puesta. La declaración de un voto caprichoso será tomada por el Consejo de Titulares en la asamblea en cuestión.**
>
> [...].

Nótese del Artículo 52 antes citado que, como regla general, se requiere una mayoría votos para la aprobación de cualquier

asunto, <u>excepto</u>, si la Ley de Condominios expresamente establece las 2/3 partes o la unanimidad de los titulares. Es decir, <u>si estamos ante una obra urgente o extraordinaria</u> —respecto a la cual, por definición, solo se requiere la aprobación del acuerdo por mayoría simple—, aplica el inciso (b) del Artículo 52, y la mayoría se calculará tomando como 100% el número total de titulares presentes o representados al momento de votarse por el acuerdo. <u>En caso de que se tratase de una obra de mejora</u>, aplica el inciso (c) del Artículo 52. De manera que, ante una mejora, <u>independientemente de que esta requiera o no la imposición de una derrama</u>, la ley exige que <u>todos</u> los titulares participen en la decisión. Por tanto, a los ausentes no representados se les notificará de modo fehaciente y detallado del acuerdo adoptado, y el acuerdo quedará ratificado si no registran su oposición dentro de los 30 días posteriores a la notificación.

Ahora bien, el referido Artículo 52 dispone que cualquier **oposición a un acuerdo que requiera unanimidad o dos terceras partes (2/3) de todos los titulares** que a su vez reúnan dos terceras partes (2/3) de las participaciones en las áreas comunes, **deberá fundamentarse expresamente, bien en la asamblea o por escrito**. 31 LPRA sec. 1922x(c). Es decir, en ningún caso la oposición podrá basarse en el capricho o en la mera invocación del derecho de propiedad. *Id.* **La oposición infundada se tendrá por no puesta. La declaración de un voto caprichoso será tomada por el Consejo de Titulares en la asamblea en cuestión.** *Id.*

-III-

Seven Three comparece ante nos y solicita la revocación de la *Resolución* del DACo y, en consecuencia, que declaremos nula la derrama aprobada el 17 de enero de 2022. Adelantamos que, por

los hechos que anteceden y el derecho aplicable a la controversia, confirmamos la *Resolución* recurrida.

En apretada síntesis, Seven Three alega que la derrama es nula porque los trabajos con los elevadores no son obras de extraordinarias, sino obras de mejoras. Para sustentar su reclamo, Seven Three arguye que del testimonio de la Ing. Cruz Moya surge que el proyecto de los elevadores constituía la realización de una mejora para hacerlos "más modernos". Que esto no es una obra urgente cuya realización no podía postergarse por representar una situación de inseguridad o por ser un servicio esencial. Por todo esto, la parte recurrente sostiene que la derrama es nula porque al ser una obra de mejoramiento, se necesitaba el consentimiento unánime del Consejo de Titulares para aprobar la derrama. No le asiste la razón.

Primeramente, reiteramos la deferencia que los tribunales revisores le debemos a las determinaciones administrativas. Recordemos que nuestro máximo foro ha dispuesto que la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo solo cede si la agencia: (1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales. *Oficina de Ética Gubernamental v. Martínez Giraud, supra.*

Por otro lado, el texto de la Ley de Condominios es clara en cuanto a las obras de mejora, las obras extraordinarias y las obras urgentes. El Artículo 3 de la Ley 129-2020 dispone con meridiana claridad que una obra de mejora es toda aquella obra ***que no sea de mantenimiento***, que va dirigida a aumentar el valor o productividad de a propiedad. 31 LPRA sec. 1921b(q). De otra parte, las obras extraordinarias son aquellas obras de mantenimiento ***no previstas en el presupuesto anual que requieran la imposición de una derrama***. 31 LPRA sec.

1921b(r). De otro lado, las obras urgentes son aquellas cuya ejecución no puede posponerse por razones apremiantes de seguridad, como por ejemplo, *la puesta en funcionamiento de los ascensores*. 31 LPRA sec. 1921b(t). Sobre las derramas, la Ley de Condominios claramente dispone que las derramas para mejoras extraordinarias o urgentes se pueden aprobar por una mayoría de los titulares presentes en la reunión, no por unanimidad.

Es un hecho probado que los elevadores del Condominio sufren de ciertos problemas en el controlador del equipo los cuales provocaron que varios de los residentes se quedaran encerrados en ellos. Del testimonio de la Ing. Cruz Moya se desprende que se les brindó mantenimiento preventivo a los elevadores para subsanar las deficiencias. Sin embargo, el mantenimiento no fue fructífero porque los problemas persistieron. De ahí, se le pidió a la Ing. Cruz Moya que inspeccionara los elevadores y realizara un informe detallando sus hallazgos. La opinión de la Ing. Cruz Moya fue que los elevadores estaban próximos a cumplir su vida útil y que por ello debían modernizarse. Entre los factores que contribuyen a esto es el hecho de que los elevadores del Condominio ya no están disponibles en el mercado porque la fabrica que los fabricó ya no existe. Por esto, la Ing. Cruz Moya recomendó la modernización de todos los levadores para que todos comenzaran un nuevo ciclo de vida útil al mismo tiempo. Esto, en lugar de reemplazar las piezas paulatinamente.

No menospreciamos el conocimiento técnico que pueda tener el señor Hsu sobre los elevadores y su vida útil. Sin embargo, Seven Three pretende derrotar el informe de la Ing. Cruz Moya a base de su propia experiencia. A manera de ejemplo, a preguntas de la representante legal del Consejo de Titulares, el señor Hsu dijo que sabía que lo expresado por los representantes de Deya

Elevator y la Ing. Cruz Moya era mentira porque él tenia un cerebro y no tenía miedo de utilizarlo.[52]

Considerada la totalidad del expediente, debemos coincidir con lo concluido por el DACo. Consideramos que la derrama aprobada el 17 de enero de 2022 es conforme a derecho, por tratarse de una obra extraordinaria y urgente, según definido por la Ley de Condominios.

-IV-

Por los fundamentos antes expuestos, se confirma la *Resolución* recurrida.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[52] TPO, pág. 47, líneas 5-8.
P   How do you know that there was that...that, that is an outright lie, that they weren't telling the truth? How do you know that?
R   Because I have a brain. I'm not afraid to use it.